IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SANDRA C. PHILLIPS CARLISLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 09-408 SLR |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

Paul G. Enterline, Georgetown, Delaware. Counsel for Plaintiff.

David C. Weiss, Esquire, United States Attorney, and Dina White Griffin, Esquire, Special Assistant United States Attorney, of the Office of the United States Attorney, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Edward C. Tompsett, Esquire, Assistant Regional Counsel of the Social Security Administration, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: September 14, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Sandra C. Phillips Carlisle ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Currently before the court are the parties' cross motions for summary judgment. (D.I. 13, 15) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

On April 12, 2006, plaintiff filed an application for DIB alleging disability beginning on August 31, 2005. (D.I. 8 at 90) Plaintiff asserted disability due to status post right foot surgery. (*Id.* at 125) Plaintiff's application was denied initially and on reconsideration. (*Id.* at 59-60) A hearing was held on February 7, 2008 before administrative law judge, Melvin D. Benitz ("ALJ"). (*Id.* at 22) Plaintiff and a vocational expert testified at this hearing. (*Id.* at 25, 48) On March 19, 2008, the ALJ issued an unfavorable decision finding plaintiff not disabled and denying plaintiff's claim for DIB.

---

[1] Under § 405(g),
[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

2

(*Id.* at 14) The ALJ found that plaintiff suffered from multiple severe impairments, including status post right foot surgery, obesity, and controlled thyroidism. (*Id.* at 16) However, the ALJ concluded that plaintiff could perform light work, allowing for two hours of standing in an eight hour period and prolonged periods of sitting, because work existed in significant numbers for an individual with these, and other, functional limitations. (*Id.* at 20) More specifically, the ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since August 31, 2005, the alleged onset date (20 C.F.R. §§ 404.1520(b) and 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: status post right foot surgery, obesity, and thyroidism (controlled) (20 C.F.R. § 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b). The claimant is capable of lifting and carrying at least fifteen pounds on a frequent basis, stand/walk for at least two hours in an eight hour period, and to sit with no restrictions. She is occasionally limited or restricted in her ability to engage in postural type activities such as climbing ramps and stairs, stooping, kneeling, crouching, and crawling. She has no manipulative, visual, or communicative type limitations. She has no environmental type limitations except that she may not be capable of working in areas subject to constant vibration.
>
> 6. The claimant is unable to perform any past relevant work (20 C.F.R. § 401.1565).
>
> 7. The claimant was born on February 17, 1957 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged

disability onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2005 through the date of this decision (20 C.F.R. § 404.1520(g)).[2]

(*Id.* at 16-20) In summary, the ALJ concluded that plaintiff's claimed functional limitations were not completely credible when considered with the objective evidence of record as a whole.[3] (*Id.* at 18) The ALJ summarized the findings of Dr. Patricia Johnson, Dr. Jose de Borja, Dr. J. Hamilton Easter, and Dr. Gedge Rosson and upheld as fair and rational the Disability Determination Service ("DDS") medical consultants' determination that plaintiff was not disabled based on the information contained in the record. (*Id.* at 19) Plaintiff appealed the ALJ's decision to the Appeals Council, which declined to review the decision, making it a final decision reviewable by this court. (*Id.*

---

[2]The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

[3]Specifically, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.* at 18)

4

at 1) Plaintiff filed the present action on June 4, 2009. (D.I. 1 at 1)

**B. Documentary Evidence**

Plaintiff claimed disability starting in August 2005 due to complications from foot surgery. (D.I. 8 at 90, 125) Plaintiff's family physician, Dr. Patricia Johnson, examined and treated plaintiff prior to the alleged disability onset date for plantar fasciitis, heel spurs and hypothyroidism. (*Id.* at 237-39, 261) In June 2004, Dr. Johnson referred plaintiff to podiatrist Stephen Wilkinson to address plaintiff's ongoing complaints of pain in her right foot. (*Id.* at 261-62) Dr. Wilkinson gave plaintiff injections in her heel, applied night splints, prescribed orthotics, Daypro and Ultram, and placed plaintiff on a home physical therapy regimen. (*Id.* at 261, 264)

By early 2005, these treatments no longer relieved the pain in plaintiff's right foot, and plaintiff complained of depression, fatigue and weight gain. (*Id.* at 257-59) Plaintiff agreed to undergo a partial plantar fascia release, and Dr. Johnson cleared plaintiff for surgery to be performed by Dr. Wilkinson on September 1, 2005. (*Id.* at 235, 257) Although the surgery went well, plaintiff struck her heel on a blunt object soon afterwards and experienced severe pain in her right foot. (*Id.* at 255-56) Dr. Wilkinson further observed that plaintiff appeared to bear weight on her foot due to discoloration in a wear pattern on her shoe. (*Id.* at 255) He placed her in a physical therapy and rehabilitation program, and he prescribed Percocet for the pain. (*Id.* at 254-55) On October 31, 2005, Dr. Wilkinson gave plaintiff permission to return to work on a reduced schedule beginning on November 4, 2005 and prescribed various pain medications. (*Id.* at 252) He also performed posterior tibial nerve blocks to relieve her symptoms.

5

(*Id.* at 250-52) Plaintiff reported that the blocks gave her complete relief for approximately 24 hours, after which she used pain medication to alleviate her symptoms. (*Id.* at 249)

In addition to these post-surgery treatments, Dr. Wilkinson referred plaintiff to Dr. Jose de Borja, a podiatrist, and Dr. Robert Ding, a pain management specialist, in November 2005. (*Id.* at 205, 220) Dr. de Borja found that plaintiff had a full range of motion in her right foot but experienced tingling in her toes and had difficulty bearing weight. (*Id.* at 205-06) Dr. de Borja concluded that plaintiff's symptoms were consistent with neuritis, tarsal tunnel syndrome, or early reflex sympathetic dystrophy ("RSD"). (*Id.* at 206) Dr. Ding recommended that plaintiff continue taking her pain medications and scheduled her for a right posterior nerve block. (*Id.* at 221) In December 2005, Dr. Ding gave plaintiff an injection in her foot and prescribed a Lidoderm patch to use locally over her foot. (*Id.* at 219) Plaintiff experienced an allergic reaction to the patch and discontinued its use. (*Id.* at 216-18)

In February 2006, Dr. Johnson recommended that plaintiff seek treatment from neurologist M. W. Kamsheh. (*Id.* at 210) Dr. Kamsheh observed that plaintiff had no weakness in her foot, was able to move her toes despite the pain, and her MRI was unremarkable. (*Id.*) He noted that her symptoms were consistent with medial plantar nerve neuropathy and continued her pain medications. (*Id.*) In April 2006, Dr. Wilkinson found fluid surrounding plaintiff's posterior tibial tendon in her MRI results and diagnosed her with sensory neuropathy. (*Id.*) Dr. Wilkinson concluded that the fluid around plaintiff's tendon was a normal variant after he found no longitudinal or

transverse splits in plaintiff's follow-up MRI and evaluated plaintiff's toe raise testing results. (*Id.* at 243)

In April and early May 2006, plaintiff completed a disability report (*Id.* at 124), work history report (*Id.* at 133), pain questionnaire (*Id.* at 151) and a function report (*Id.* at 114, 143). In these various forms, plaintiff indicated that she stopped working on August 31, 2005 due to her condition because her job required her to stand on her feet for 8 to 10 hours per day. (*Id.* at 125) Plaintiff is capable of sitting "forever," but she can only stand or walk for about 20 minutes before taking a break. (*Id.* at 115, 125, 148) She reports that she can pay attention for "as long as needed" and indicates that she has no problems with her memory. (*Id.* at 116, 119) She can drive a car and goes to the store occasionally to buy food and medication, but she finds driving to be painful. (*Id.* at 117, 125, 146) Additionally, plaintiff claims that she loses sleep at night due to the severity of her pain. (*Id.* at 115, 144, 151)

Plaintifff's responses to the questionnaires also provide a depiction of her daily life. (*Id.* at 143) Plaintiff lives with her cousin and her cousin's husband. (*Id.* at 118) Plaintiff is generally unable to sleep at night due to the severity of her pain. (*Id.* at 151) When she is awake, she watches television, reads, and learns how to use a computer. (*Id.* at 118) She does not need assistance in caring for herself, although she typically experiences sharp pain when she stands barefoot in the shower. (*Id.* at 115, 144) She sometimes cares for her grandson by changing his diaper and feeding him. (*Id.*) Plaintiff is able to perform household chores such as doing her laundry, preparing meals, making her bed and cleaning her room. (*Id.* at 116, 145)

On September 1, 2006, Dr. Michael Borek of the Social Security Administration conducted a review of plaintiff's case file and determined that plaintiff's condition was not severe enough to prevent her from working. (*Id.* at 61) Dr. Borek based his determination on the fact that plaintiff was able to walk and move sufficiently despite discomfort in her foot and ankle. (*Id.*) Plaintiff filed a request for reconsideration of her claim on October 26, 2006. (*Id.* at 66) Upon reconsideration, Dr. Robert Palandjian likewise determined that plaintiff's condition was not severe enough to prevent her from working, and there was no medical evidence of significant weakness in her foot. (*Id.* at 67) The medical consultants considered the reports of Dr. Wilkinson, Dr. Johnson, Dr. de Borja and Dr. Ding in reaching their conclusions. (*Id.* at 273)

Dr. J. Hamilton Easter evaluated plaintiff in September 2006 and, consistent with Dr. Wilkinson's findings, he found no abnormalities in plaintiff's X-rays or MRI films, but he suggested that plaintiff had developed microtears of the plantar fascia due to her fasciitis, and her tingling was likely caused by entrapment of the posterior tibial nerve and scar tissue. (*Id.* at 276) Dr. Easter scheduled an appointment for plaintiff with Dr. Kupcha, a foot and ankle specialist, who subsequently referred plaintiff to Dr. Gedge D. Rosson. (*Id.* at 276-79) Dr. Rosson concluded in November 2006 that plaintiff likely had some compression of the tibial nerve in the tarsal tunnel. (*Id.* at 278) Dr. Rosson suggested that plaintiff may ultimately need an extended tarsal tunnel release and decompression of the medial plantar nerve, lateral plantar nerve, and calcaneal nerve, but he allowed plaintiff to focus on nonoperative pain management to avoid surgery. (*Id.* at 279)

Plaintiff continued to experience pain in her right foot in February and March 2007, and Dr. Ding treated plaintiff with electric stimulation and started her on TENS treatment[4] at home, although plaintiff found the TENS treatment ineffective. (*Id.* at 298-304) Dr. Ding performed another posterior tibial nerve block on plaintiff in June 2007, but plaintiff reported that the procedure aggravated her pain for ten days, after which the pain returned to its normal level of about six out of ten. (*Id.* at 298-99) As of August 2007, Dr. Ding noted that plaintiff had a severe Tinel's sign[5] when percussed over the tibial nerve in the right tarsal tunnel, the deep peroneal nerve on the dorsum of the foot, and over the common peroneal nerve at the right fibular neck. (*Id.* at 290) Dr. Ding diagnosed plaintiff with a mild, underlying neuropathy of unknown etiology and compressions of the nerves in her right foot. (*Id.* at 291)

Dr. Ding recommended surgery to relieve plaintiff's nerve compressions, noting that this would likely relieve the underlying neuropathies as well. (*Id.* at 296-97) From October 2007 to January 2008, Dr. Ding observed that plaintiff's right foot appeared normal compared to the left foot and noted improvement in the right foot. (*Id.* at 292-96) Plaintiff decided against surgery in January 2008. (*Id.* at 292) Plaintiff stated that Lyrica and Vicodin helped ease her pain. (*Id.* at 294, 301)

---

[4] TENS is an acronym for Transcutaneous Electrical Nerve Stimulator. It is an electronic device that produces electrical signals used to stimulate nerves through unbroken skin.

[5] Tinel's sign is a tingling electric shock sensation that occurs when you tap over an affected nerve.

### C. Hearing Before ALJ

#### 1. Plaintiff's testimony

Plaintiff was 51 years old at the time of the ALJ's decision. (D.I. 8 at 44) She has a twelfth grade education and past work experience as an assistant manager at a convenience store and a waitress. (*Id.* at 43, 49) Plaintiff is divorced and has grown children. (*Id.* at 45) She lives with her cousin and her cousin's husband. (*Id.*) She is five foot seven and weighs 204 pounds.[6] (*Id.* at 44)

At the hearing, plaintiff testified that she worked until the beginning of September 2005. (*Id.* at 26) Plaintiff has had bad feet for a number of years, and she does not believe her condition was caused by her work as assistant manager at Wawa. (*Id.* at 46) She collects long term disability from Wawa in the amount of $1,863.00 per month. (*Id.* at 45) Following her surgery in September 2005, she could not bear weight on her feet for six weeks and was unable to work during that time. (*Id.* at 28) She accidentally hit her heel shortly after the surgery, and she realized that her foot had not healed properly when she began walking and going to physical therapy. (*Id.*) Fearing that another surgery would cause her more pain, plaintiff went to a pain management specialist instead. (*Id.* at 29, 42)

Plaintiff takes Lyrica and Vicodin several times daily for her pain and reports that the drugs make her feel tired.[7] (*Id.* at 30-31) Despite these medications and other

---

[6]Plaintiff testified that she weighed approximately 234 pounds at the time of her surgery, but she has lost over thirty pounds by participating in Weight Watchers. (*Id.* at 44)

[7] Plaintiff takes Synthroid for her thyroidism and reports that it controls her condition. (*Id.* at 197, 261)

forms of relief, plaintiff's pain "absorbs" her, especially at night, when it prevents her from sleeping. (*Id.* at 31-32) Plaintiff passes the time by watching television or reading, but the pain disrupts her concentration. (*Id.*) She experiences less pain during the day, but her medication only lasts for a few hours and does not eliminate the pain. (*Id.* at 35)

Plaintiff's daily routine varies from day to day depending on the severity of her pain, but she generally goes to bed at around 9:00 a.m., naps throughout the day, and wakes at night due to the pain. (*Id.* at 36) With respect to chores and cleaning, plaintiff prepares her own meals but can only stand at the counter for about 20 minutes.[8] (*Id.* at 36-37) Plaintiff testified that she can sit "forever" and can lift between 10 and 15 pounds. (*Id.* at 46) She does not go grocery shopping. (*Id.* at 38) Plaintiff drives only occasionally and for short distances, such as to go to her doctor's appointments 20 minutes away. (*Id.* at 38, 47-48) Plaintiff testified that she has difficulty remembering and concentrating due to her pain. (*Id.* at 39) Her only social activity is her weekly Weight Watchers meetings. (*Id.* at 39-40)

At the hearing, plaintiff testified about her medical treatment. Plaintiff has visited Dr. Ding since December 2005 for pain management. (*Id.* at 42) Dr. Rosson, a surgeon in Baltimore, recommended that plaintiff undergo surgery to correct damage to her nerves. (*Id.*) However, plaintiff does not want to undergo another surgery due to the negative experience she had with the surgery performed on September 1, 2005. (*Id.* at 43) Plaintiff consulted with her family doctor, Dr. Fink, regarding her problems

---

[8] Plaintiff's family members take care of day-to-day necessities. (*Id.* at 36, )

with her memory and inability to concentrate. (*Id.* at 47) Dr. Fink recommended that she see a counselor, but plaintiff has not sought treatment and is not on medication for her memory and concentration. (*Id.* at 47)

Plaintiff wears special footwear because traditional shoes and socks are too painful for her to wear. (*Id.* at 41) She has inserts to put in her normal shoes, but she does not wear her normal shoes because they are too uncomfortable. (*Id.* at 41) Plaintiff uses a cane when she needs to walk for more than 20 minutes, and she brings the cane with her everywhere even though she does not use it around the house. (*Id.* at 41-42) Plaintiff's only other medical problem is a thyroid disorder, which is controlled with medication. (*Id.* at 40) Her doctors have not placed any limitations on her activities. (*Id.*)

### 2. Vocational expert's testimony

After Dr. James Michael Ryan, the vocational expert, discussed plaintiff's past relevant work, the ALJ asked Dr. Ryan to assume a hypothetical individual with plaintiff's vocational characteristics and give an opinion as to whether such a hypothetical individual could perform a significant number of jobs in the economy. (*Id.* at 49-52) The following exchange occurred between the ALJ, vocational expert and plaintiff:

> ALJ: I'd like for you to assume a person who is 48 years of age on her onset date, which she puts in 8/31/05, has a 12th grade education, past relevant as indicated, right-handed by nature, suffering from the status post affects of surgery on her right foot and toe causes some numbness and pain of a moderate degree, severe on occasion. She indicates she derives some fatigue as a result of some of her medications. She does have decreased ability to stand and walk is, however, from the operation. She has some obesity but she is losing weight. She says 204 today. And

> her thyroidism is controlled by her medications, and she derives some tiredness from her medications. And if I find, Doctor, that she can lift ten pounds frequently, 20 on occasion, can sit for 15 to 20 minutes, stand 15 or 20 minutes, consistently on an alternate basis during an eight-hour day, five days a week, but would have to avoid heights and hazardous machinery, temperature and humidity extremes, vibrations, no prolonged climbing, balancing, and stooping, and by that I mean no more than one or two times an hour. And would be moderately limited in ability to operate a motor vehicle and limited in push and pull in that right lower extremity – it's the right foot, is it?

At this juncture, the ALJ elicited from plaintiff that the injured foot is her right foot. (*Id.* at 49-50) The ALJ continued:

> ALJ: Right lower extremity, who would seem to be able to do a sedentary and light work activities. Are there jobs out there, Doctor, such a person can do in your opinion as a vocational expert, in significant numbers?

(*Id.* at 50) The vocational expert testified that such a hypothetical individual could perform a significant number of unskilled light and sedentary jobs in the national and regional economies. (*Id.*) Light jobs included machine tender, quality control worker, and packer or packaging worker. (*Id.*) Sedentary unskilled jobs included inspector, small parts inserter, and bench worker. (*Id.* at 51)

On examination by plaintiff's attorney, the vocational expert indicated that the ALJ's hypothetical accounted for plaintiff's concentration and memory limitations by specifying that the jobs must be unskilled and involve simple tasks. (*Id.* at 52) However, the vocational expert acknowledged that when the hypothetical individual could stand for no more than 20 minutes at a time and concentrate for no more than 30 minutes at a time before requiring a break, and where at least once every hour, the person experiences shooting pain that interrupts the activity and requires a recovery period of several minutes, such a person could not do any of the jobs listed by the

vocational expert. (*Id.* at 56)

## III. STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. See *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. See *id.* In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. See *id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." See Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the

[Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Eligibility for DIB under the Social Security Act is conditioned on compliance with all relevant requirements of the statute. *See* 42 U.S.C. § 423(a). The Social Security Administration is authorized to pay DIB to persons who are "disabled." 42 U.S.C. § 423(a)(1)(E). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *See* 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii)

(requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[9] *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(d).[10]

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the

---

[9] Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii).

[10] Prior to step four, the Cornmissioner must assess the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)

Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. See Plummer, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC.]" Id. This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted. Id.

### B. Whether the ALJ's Decision is Supported by Substantial Evidence

In the present case, the court recognizes that the first four steps of the five-part test to determine whether a person is disabled are not at issue: (1) the ALJ determined that plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability in August 2005; (2) the ALJ qualified plaintiff's impairments as "severe" impairments; (3) the ALJ determined that plaintiff's impairments do not meet or medically equal one of the medical impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, that would preclude any gainful work; and (4) the ALJ determined that plaintiff is unable to perform any past relevant work. Plaintiff contests the ALJ's finding regarding step five in the regulatory process.

Specifically, plaintiff challenges the ALJ's finding that plaintiff has an RFC for light work as defined under 20 C.F.R. § 404.1567(b) because light work requires substantial walking or standing. (Id. at 6) "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001) (quoting Burnett

*v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)). The ALJ must consider all relevant evidence when determining an individual's RFC, including medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a); *Fargnoli*, 247 F.3d at 41. Further, the ALJ's RFC determination must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Fargnoli*, 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

The court finds that the ALJ's decision is materially defective in several respects and that it is necessary to remand this case for further findings. In this case, the ALJ ignored the medical records of Dr. Wilkinson, who performed plaintiff's surgery, evaluated her subsequent MRI results, and treated her extensively following the surgery. The ALJ also failed to acknowledge the medical reports of Dr. Ding, who treated plaintiff for pain management for several years following her surgery, and Dr. Kamsheh, who treated plaintiff's neurological symptoms and evaluated plaintiff's MRI results. These reports constituted a substantial portion of the record, and the ALJ provided no explanation for his failure to address them. Further, the ALJ did not sufficiently explain the level of consideration given to the medical records from Drs. de Borja, Johnson, Rosson, and Easter.

It is well established that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence." *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'") (internal citations omitted). The Third Circuit has stated that an ALJ cannot disregard the opinion of a treating physician without referencing objective medical evidence conflicting with the treating physician's opinion and explain the reasoning for rejecting the opinion of the treating physician. See Gilliland v. Heckler, 786 F.2d 178, 184 (3d Cir. 1986). The court finds that the ALJ's RFC determination is deficient due to his failure to consider the medical opinions of Drs. Wilkinson, Ding, and Kamsheh, in addition to his failure to describe the weight given to the medical opinions of Drs. de Borja, Johnson, Rosson, and Easter.

On remand, the Commissioner should carefully consider the medical reports of plaintiff's treating physicians and specifically discuss the basis, if any, for rejecting those opinions. Further, the Commissioner must determine whether plaintiff has the RFC to perform light work based on sound medical evidence.

## V. CONCLUSION

Because the opinions of plaintiff's treating physicians were not given appropriate weight, the court finds that defendant's decision was not based on substantial evidence. The court remands the case to defendant for further proceedings, consistent with this memorandum opinion. An appropriate order shall issue.